One of your honor, please the court. My name is Richard Hamlisch. I represent Appellant Efrain Cruz. This case is unique in a couple of different ways. Although the parties briefed thousands of pages of evidence, et cetera, on the motion for summary judgment, it came down to an issue of prejudice. At oral argument, the district court said, I can't find prejudice. Mr. Cruz, what he did, he caused himself. That theory, if we follow it, is very, very dangerous. Very dangerous. It shows a lack of knowledge of two things. What's going on in that real world out there? And number two, what goes on in a trial courtroom in a criminal case? Let me address the criminal case side of it first. Assuming that Mr. Cruz knew who the shooter was and his family knew who the shooter was. Now, we get into a courtroom. Mr. Cruz, in his defense, gets up on the witness stand and says, I didn't do it. He did it. And his family gets up on the stand and says, my son or my cousin or my brother didn't do it. He did it. What does Mr. Dozier, the prosecuting attorney, do? First thing he says is, this man over here didn't do it. We know that because the judge has already dismissed him from this case. Mr. Reyes had been dismissed at the preliminary hearing. Would any defense attorney in his right mind allow his client to get on the stand, point his finger at a man who's a judge, and the judge will tell the jury this man has been dismissed? Doesn't happen in any courtroom. Any defense attorney who would do that is incompetent. The – and that leads me to the next point, a little different from prejudice, but at the preliminary hearing where Mr. Reyes was dismissed sat three or four police officers. One of those police officers was the one who took the inventory of vehicles at Lot 10 where the shooting took place. That police officer knew, because he wrote down the license plate of Mr. Reyes's car, that Mr. Reyes was in that parking lot that night. Now, why didn't he step forward and say, hey, wait a minute, Your Honor, we know he was in the parking lot. He didn't. Mr. Goeder knew it because he had the police report. Mr. George knew it because he altered his police report to change one number in the license plate to show that Mr. Reyes wasn't there. Changes the whole case if that report comes into evidence. Going to the other side of the prejudice issue, in the real world, we have gangs. The Oxnard gang, the Colonia Chique, are probably one of the most vicious gangs in the country. They run Oxnard. And the – Mr. Bradbury and his successor in Ventura County has done a good job of in the last couple of years of getting it down, but they still are very powerful. Powerful to the extent that when they say, don't testify, don't do this, you're intimidated. To the extent that Mr. Reyes had the guts, and it's in the record, Mr. Lacks testified in his declaration, Mr. Reyes came to his office and said, how's the case going? And Mr. Lacks said, what do you mean? He says, well, you know, I think you should do this, this, and this. Or I don't think you should do this. He's telling him how to run the case. The man who pulled the trigger is telling him how to run the case. Mr. Lacks testified he's intimidated by this. So the real world out there is a lot different than it is in this courtroom. And that's what we have to think about. If we allow this type of conduct where the prosecutors know who the right shooter is, they are told by the best gang police expert, Dennis McMaster, who the shooter is. I didn't understand that from the record. How did this guy know who the shooter was? He looked at a videotape. Was the videotape of the shooting, or was it just people coming out of the bar? It was of people coming out of the bar, in the bar, on the street. How can you tell who the shooter is by looking at who's coming out of the bar? Your Honor, I can't answer that directly. I can only answer you in what Mr. McMaster tells me and what he told the prosecutor later on. When he saw Mr. Gerardo Reyes, among these other people, he said, there's your shooter. I mean, it didn't take two seconds. Now, how does he know that? He's been dealing with Mr. Reyes since he was a little kid. That's number one. The supposition that he made that he's probably the baddest guy in the group, and that's basically what it is, isn't it? The only one who uses a gun in the group. The only one with a history of gun use. That's how he made the decision. That's what he told me. And not only that, Mr. McMaster was told at the time they had the shooter in custody. So he believed them. When Mr. McMaster found out later on, two years later, that of the circumstances of what went on, that they knew that Romero Reyes and Gerardo Reyes had had a discussion and it was overheard, and the prosecutor knew of that discussion and never turned it over to the district, to the defense, Mr. McMaster started his own investigation, along with the Ventura County District Attorney, Mr. Haney, and Mr. Bradbury. And they, in their investigation, came up to the conclusion, Mr. Cruz is not the shooter, Mr. Reyes is the shooter. If your client was intimidated, and that's why he was testifying as he was, why would he not be intimidated even if stuff was turned over to him? I'm sorry, I didn't. Well, you're saying the reason he testified that Reyes wasn't there, wasn't the shooter, and so on, was that he was intimidated. Yes. That's the suggestion. He was afraid of what happened. How would that have changed if he'd been supplied with additional information? Because Mr. Reyes was in custody. Mr. Reyes was later arrested and sentenced to 12 years in state prison. Now, does the record now, once everything turned over and your client was freed and so on, has he said that the reason that he was originally testifying as he was, was that he was intimidated or was he just trying to protect his cousin? There was no evidence that he was ever trying to protect his cousin. That never came up. Was there any evidence that he was intimidated now? I can't say the word intimidated was used for sure, but the interview in Chino State Prison with the representatives of the Ventura County Sheriff's Department and the prosecutors from Ventura indicate that was their conclusion rather than maybe his words. I don't know. I can't remember exactly. I've heard the takeover, and, again, if you hear this for three or four years, you start to lose track of who said what to whom at exactly the time. But the indications, the implications were. And Mrs. Reyes, his mother, specifically said she was intimidated. This is her nephew. Mr. Gerardo Reyes is her nephew. And, you know, there was, again, it's not in the record, but there are several people who were witnesses to this who are not here anymore. And, again, nobody's ever been charged for their disappearance, et cetera, but they're not around anymore. Mr. Romero Reyes disappeared. He was an eyewitness. He disappeared and ended up in Colorado. Santa Barbara police found him in Colorado, brought him back. As they brought him back, they know he's an eyewitness. He tells the officer on the airplane, you got the wrong shooter in jail, and the officer doesn't tell the defense about it, tells everybody else, tells the entire prosecution team, and the police, doesn't tell the defense. Why not? Here you've got an eyewitness. They charge him with aiding and abetting. They convict him, or he pleads out on aiding and abetting, but they don't tell the defense that he has said he got the wrong shooter. Why not? One of the things that struck me about the district court's decision was that virtually every conclusion the court came to was contrary to Judge Ochoa's decisions. Judge Ochoa said the suggestive identification, there was no question about it, constitutional violation, no question about it. Judge, the district court here said no. The court struck Mr. Schomer's testimony. For what reason? We don't know. Judge Ochoa was the judge at the state habeas proceeding? At the habeas proceeding and the original trial. Okay. At the original trial, was there a motion to exclude the identification? To exclude the identification is unduly suggestive? My impression of the record is that there was no challenge to the identification at the time of the original trial. Oh, yes. No, no. As being unduly suggestive. Mr. Schomer testified at the original trial. Mr. Schomer is who? Is the expert on suggestive identifications from UCLA. The identification was not excluded at the original trial. No, it was not excluded, but it was challenged at the original trial. Okay. If Judge Ochoa said it was improperly suggested, why didn't he exclude it? I can't answer that, because at the habeas hearing, he came to the conclusion that it was suggestive, and it shouldn't have been allowed. I can't explain what happened, what was in the judge's mind at the original trial. But at the habeas, he did say it was suggestive. The Markell, Freisley, and Aceves reports, judge, district court in this case, said defense had it. Judge Ochoa came to the judgment that they didn't have it. Now, he heard these three police officers testify at both the trial and the habeas, never heard either one of the police officers talk about their reports or talk about their conversations with the Reyes sisters, nothing. Why didn't they testify about it? Which would certainly cast reasonable doubt on who the shooter was. Judge Ochoa said that is the crucial evidence. And the court, and he underlined it in his opinion, we have never seen this before. It was not present in the courtroom at the trial or at the habeas until defense brought it in and was confirmed. District court says they had it all the time. They didn't use it with their strategy. It just why the conflict between what the district court comes to a conclusion of and what the superior court came to a conclusion of? The superior court had 19 days of habeas, 15, I guess, 14 or 15 days of actual trial. So almost 35 days of hearing these people testify. The district court never heard any testimony, not even one day's testimony, not even one hour's testimony, but came to a conclusion that all these things are true. Which brings me to my last point on prejudice, and that is, is prejudice a matter of law or a matter of fact for the court to decide,  I can't find any case that says prejudice is a matter of fact for the court to decide. Cannot find one. And defense hasn't brought one up at all. There is none. There is the cases I brought up. I wrote on the brief the Central Railroad case. The court said that the Interstate Commerce Commission is the finder of fact. And prejudice is a factual finding. It's not a matter of law. The Interstate Cleaning case, same thing. The court says, although a question of fact, the issue of prejudice may be a question of law if there is no dispute as to the facts. In this case, there are hundreds of pages of disputes as to the facts of the law. So the prejudice is a matter of fact for a jury to decide, not a matter of law for the court to decide. Whether the district court could find prejudice or not is not really relevant to this case. What is relevant to this case is whether or not there is a dispute of fact as to prejudice. And if there's one dispute of fact, one material fact and dispute, we go to trial. And that's where we should be. We shouldn't be here today. We should be at trial. Do you want to reserve any time for rebuttal? Yeah, I was just looking at the clock. Another 45 seconds. I think I'd like to talk about the McGrew situation. There were two, at least, and maybe three, Officer McGrews in this case. When I came into the case, I knew of one. And Mr. McGrew was not the officer who took the inventory of Lots 10. He was the officer who did the suggestive interview in San Diego. Later on in this case, I find out who McGrew is. And to be honest, it was an oversight on my part. There are thousands and thousands of pages of evidence in this case. The court has, I think in its file, somewhere around 20,000. Because I turned my expert correct was almost 10,000. And their supplement was almost that much. Somewhere in there, I found a second McGrew. I asked to supplement or amend the complaint to add McGrew. The court turned it down and said, you already knew about him. Well, there were two or three McGrews there. And one is Tom McGrew and Mike McGrew. I mean, I'm making up names here. I don't know if they remember their names right now. But that was the man who took the inventory and then changed the license plate number. And the court, Judge Ochoa, looked at it and said, hey, here's George's. Off of George's inventory, it says number 1234, license plate, which belonged to Reyes's car. This one says 1235. And the 5 is changed. We know it was a 4 originally. The evidence was changed by the district attorney. When it was brought to the attention of the prosecutor, if you look at the record in the habeas corpus, the last day, Mr. Dozier said, wait a minute. We're going off the record on this. I want it on the record. He didn't want it on the record that this was the documents were altered and that he may have been, I don't know, I'm guessing, whether he was part of that alteration, so that Mr. Reyes's car was not identified in the parking lot on Lot 10. And his statement at the preliminary hearing, he knew was an error when he said it. I'll reserve my time. Thank you, Mr. Hamilton. Good morning. Stephen Wiley for the city of Santa Barbara and the city defendants.  Counsel for Mr. Cruz has been consistent, and unfortunately, it's a consistency having to do with what I think can really only be characterized as a tendency to testify rather than to discuss the real record in this case, whether it's a briefing or here today. You know, I should have asked you at the outset if you gentlemen have decided how you're going to divvy up the time. Yes, I'm going to try to keep my remarks to about five to seven minutes. Oh, great. Okay. And invariably that sort of causes me to want to dispute quite a few things. I think I should respond to some of those questions that were raised. The fundamental aspect to this case, which is inescapable, is what the Second District Court of Appeal, Division VI of the State of California concluded. The substantial evidence supported the conviction of Mr. Cruz. Clearly, they were referring to an eyewitness identification. This was just someone who happened to be in the parking structure that night who witnessed the murder, actually saw it. And in response to the question about the videotape identification, his name was Mr. Freeze, lived in San Diego. This videotape was a security tape of a bar, the Hurricane Bar. Mr. Freeze was in that bar that night. Mr. Cruz was in the bar that night. And apparently the murder victim, James Miranda, I'm sorry, James Miranda was wounded. Michael Torres was killed. Two Santa Barbara City College students were in the Hurricane Bar that night, right adjacent to the parking structure. This was a security film of the entrance where the security guard was checking identifications, and that was being filmed. This was the film that was shown to Mr. Freeze, and he pointed out Mr. Cruz as the shooter. So when the Court of Appeal said substantial evidence supports the conviction of Mr. Cruz, they were, of course, referring to this eyewitness identification probably referring to the fact that Mr. Cruz had gunpowder burns on his hands as well. What Mr. Cruz's attorney did not mention was a conscious decision on Mr. Cruz's part not to implicate his cousin in this murder in his deposition in connection with this case that the city took. Mr. Cruz is asked the question, what was your strategy at trial, Mr. Cruz? My strategy was to not give anybody up, to try to keep everybody as far, especially my cousin, as far away as being mentioned as possible, his name even being mentioned. I was trying to keep him as far away from my lips as possible. Question. And you were doing that even though you knew he was the one that had fired the gun and killed the individual. Correct. It's not untypical in an appeal to try to change the rules, to move the ball, if you will. This is about the district court's decision. Mr. Cruz's counsel, Mr. Hanlisch, virtually does not mention that decision at all, but when he does, he mischaracterizes something very important to the point, frankly, where it's misleading. He says that the superior court judge, the trial judge in the criminal case, as well as the habeas judge, made certain findings that are directly contrary to the district court's determinations. It's not true. He does not cite anywhere to the record of the superior court judge's decision to support that, and it is, in fact, not true. For example, he is saying that Judge Ochoa, the superior court judge, thought it was significant, this conversation between, there were two sisters, Ronca Reyes, Margarita Reyes, that they're not related to Gerardo Reyes, the person who was subsequently implicated, but they were interviewed by a Santa Barbara police officer, and they both testified to a conversation between Gerardo Reyes and another individual by the name of Ramiro Reyes hours after the murder. And this conversation, when you see it, the notes of it, it's ambiguous. It's something about Gerardo Reyes being angry, something about what happened to the gun and the ability to retrieve the gun, and something about someone firing a gun and it going click, click. Well, there's a couple things that, it's ambiguous. The gun, when it killed someone, did not just go click, click, clearly. Those were notes taken by Detective Martel. And in his argument, counsel just said that Judge Ochoa said, oh, that was tremendously significant. If that had been known at the trial, it would have made all the difference in the world. He said something like that, but that's not the point. The point is that the district court judge said that that information was turned over to the attorney for Mr. Cruz prior to his preliminary hearing. Within days of his being arrested, before the preliminary hearing, the police reports on those conversations were made available. You know, we all learn as lawyers very quickly when we have to turn something over to the other side that you've got to do it in a very systematic way. And prosecutors in particular now know with Brady that they've got to index everything. They've got to bait stamp everything. They've got to keep a master copy. Attorneys do this. We know how to prove that we turned something over. And if you look at the district court's decision, she – it's a very thorough decision, very impressive in terms of her understanding of the facts here. But the bait stamping and the indexing by Mr. Cruz's attorney, his – the attorney that handled his preliminary injunction, proved that he had those materials. The only contrary evidence, and it hardly qualifies for the term evidence, is a declaration from his second attorney, the trial attorney, that he didn't get it. He doesn't say how he – he didn't get these reports. He doesn't say how he knows that because he destroyed his file shortly after the conviction. All of the – so what Judge Ochoa was saying is if that testimony had occurred at trial, it might have made a difference. But my point is the witnesses were available. The reports were made available to the – to Mr. Cruz. The witnesses were there. They chose not to use them. That's consistent with Mr. Cruz, his girlfriend who was present at the scene of the murder that night, saying that she testified at the preliminary hearing and – and placed Gerardo Reyes not there. Gerardo Reyes wasn't there. Mr. Cruz's girlfriend took the stand at the preliminary hearing and said Gerardo Reyes wasn't there. So why did the judge making the preliminary hearing determination release Gerardo Reyes? Well, it had to have been in large part because a witness said he wasn't there. He was not arrested at the scene. But my time is up. And I will just emphasize the – the thoroughness of the district court's decision. And one final point on this question of prejudice, because it clearly was what the district court's decision turned on. Whether it's Brady or Strickler v. Green, these are legal elements established by the Supreme Court of a Brady violation. And legal elements like that are determined by a judge and not by a jury. I don't care what a civil case about the Interstate Commerce Commission says with respect to a word like prejudice. One question. One thing that seems clear wasn't turned over were handwritten notes by Officer Martel. We cannot prove they were not turned over. Officer Martel, in the record, has a declaration saying that he's a – at the time, he was a 22-year cop. He is now a lieutenant. He says it's always been my practice. He was the lead investigator. He kept the binder. He has three receipts for turning things over to the district attorney. But in all honesty, he could not do that thing that lawyers can learn to do. Can I prove that I specifically turned that document over? I turned everything over. But now, at this point, in hindsight, I can't prove that I turned over those notes. He also says, I didn't – I didn't interview those two sisters as part of the investigation. I was trying to – they were Ramiro Reyes's sisters. I was trying to get Ramiro to turn himself in. And I went to – I knew where I could find them. I went to try to get a message to him. It would be better for you if you turned yourself in. That's his explanation for not considering the conversation all that significant or informative. He did keep his notes. We – everyone has his notes. But in retrospect, he could not prove those specific notes were turned over. But, again, he gets back to there was a conscious strategy at trial that – to not implicate Gerardo Reyes. So those notes wouldn't have been used. Weeks after the trial and the motion for a new trial, then they decided to try to implicate Gerardo Reyes after the conviction, or at least after the jury verdict. Thank you. Good morning, Justices. Jake Stoddard on behalf of the County of Santa Barbara and the county defendants. I would just – and I would like to reserve at least two minutes. I don't really have anything to reserve. Oh, I don't get to reserve. Okay. The idea of the car that Mr. Hamlisch has brought up again, and he brought it up repeatedly in his brief, but he never cites to the record. And the reason that he cannot cite to the record about the car is that the representation that he is now making to you is not true, nor is it even the representation that he made in his opposition to our summary judgment motion. So I'd like to take just a minute to sort of put the car, which is one of the many fictions in this case, to rest. Officers did respond. Officers, two different officers, did do lists of all the vehicles. Both of those lists were produced to the defense. There is a different number on one. There is a transposed number on one of these literally hundreds of license plate numbers. If you change that one number, it would not be Mr. Reyes's car. There is no evidence that Mr. Reyes's car had his license number taken down. One of those would reflect Crystal Bryson's car. Crystal Bryson was the girlfriend of Leo Gonzalez, who was also in the video. Leo Gonzalez was the co-defendant of Mr. Cruz, who was also convicted. Crystal Bryson's car could have been in the parking lot. She testified she had parked it there earlier that evening. There were testimony of three different cars that we know of. Mr. Cruz testified at trial that he drove a black Nissan that belonged to his aunt. There was testimony that Mr. Reyes drove a Mustang. And then there was Crystal Bryson's black Honda. It seems unlikely that the black Honda remained in the parking lot for the police officers to note that license number down, because when the black Honda was seized, there was blood in the back seat of the car and blood on the handle, which also, coincidentally, there was blood found on Leo Gonzalez's clothes when they executed the search warrant. So that's the explanation of the car. As to prejudice, I don't know. I'm sorry. There was nothing that connected Reyes's car to any of those plates. Correct. Yeah. And you can ask him to cite to someplace in the record, but it's not there because Reyes's car, his license plate was never noted in any of those lists. And the lists were clearly produced, and that's shown because of, and it's a bit of a process to go through, but what we produced to the district court was Mr. Reyes's co-defendant at the preliminary hearing. The entire record that his lawyer had received from the DA's office was signed receipts. Bait stamped. In this record before you, I had all those bait stamps made yellow so that you can see. We then have Mr. Cruz's counsel's note that indicates who the various people are, who made statements, and if you match those numbers, Bill DeVault's numbers up, they match up to the bait stamp numbers in Mr. Crowder's separate copy. We then have, in addition, the counsel, once Mr. Lacks comes in, we have Mr. Dozer, the DA, sending copies of those receipts to Mr. Lacks, saying, here is what I've produced to Mr. DeVault, bait stamp numbers, 1 through 486, and all the tapes and all the receipts to Mr. Lacks. You have Mr. Lacks's correspondence saying, I've received, quote, tons of material from my predecessor. And lastly, I'd like to make the point that it is undisputed at trial that Mr. Lacks attempts to introduce Leonard Paradis, Mr. DeVault's investigator for Mr. Cruz, his interview of Valerie Ortiz. He's unsuccessful. He doesn't get any evidence. He goes up on appeal on that issue. He loses on appeal on that issue. Where did he get that if he didn't get it from Bill DeVault? It was his investigator. He clearly had that piece of evidence. So I think as the district court found, there is no question of fact that all of that material was produced to trial counsel. As Mr. Wiley indicated to your question about what, whether he was trying to protect anyone, he quoted from his deposition testimony that, in fact, that was his trial strategy. He wanted to protect his cousin. He did not want to point the finger at anybody in his family. I think that the prejudice issue, what the Court was talking about, in the California discovery practice, Doug Pipes, the former district attorney, does the criminal discovery rules for California. It's a Lexis publication. And he talks about the violation of Brady, three elements, favorableness, suppression, and prejudice. That's when you're looking at a violation. Prospectively, he would call that favorableness, possession by the district attorney, and materiality. And it was that prejudice that the district court was referring to. It was the Brady prejudice. It was that it – is there a substantial likelihood disclosure would produce a different result? And as to the Martel notes, that was the prejudice she was talking about, that there was not a likelihood that disclosure of those Martel notes would have produced a different result because the defense possessed the same information already. They had Freisley's report. They had Esteves' report. They had the fact that Mr. Cruz was present, that Mr. Cruz absolutely knew who the shooter was, that, in fact, his cousin, Mr. Reyes, had told him about his conversations with Romero Reyes while the two of them were in custody. They had all the information. They had Valerie Ortiz in this – in this statement to Mr. Paredes. The prosecution never had that. They didn't get it until the middle of trial. They had all of that information. Now, once again, not only are we confused about the word prejudice, but this idea that Judge Ochoa made any of these findings, what Judge Ochoa said was their conversations with Romero Reyes' sisters were brought forth for the first time in the writ proceedings. There were important and compelling evidence in regard to the identity of the shooter. Judge Ochoa never made a finding that there was a Brady violation, and he never, in his order, indicated in any way, shape, or form that those material had not been turned over to the defense. No one asked those questions at trial because it was the defense. They didn't put that on. That's why it didn't come out. Ochoa doesn't make any finding in any way that says that he thinks there had been a Brady violation of that material. The material didn't produce. The defense just chose not to use that defense. Likewise, as to the identity issue, Ochoa was the trial judge. Ochoa heard the arguments. Ochoa let Schomer testify. He never found that it was overly suggestive and that, therefore, should have, the identification should have, should have been stricken. He questions it later when he's deciding that, in fact, he believes that it was, or he doesn't believe, but he finds there's sufficient evidence to believe that Reyes may be the shooter. But he never, there was never a finding that there was something wrong or constitutionally invalid about that identification process. What else could they do? They have a videotape from a bar. They are investigating a murder and somebody else who is a victim of an assault. They, what are they supposed to do with it? They can't show it to a witness? Does that mean any time that a bank is robbed and you're looking at that video that shows the perpetrators coming in, you shouldn't show it to someone? There was nothing inherently wrong with it. It's the, it was the evidence that they were presenting. If the Court has any questions either as to whether you believe there's any constitutional violation here, or if there were, why the district attorney wouldn't be absolutely immune from everything that happened, I'd be glad to answer any such question. Roberts. Mr. Hamlisch, back to you for two minutes and a half. Hamlisch. One or two things real quickly. Mr. Stoddard asked the question, why didn't the defense bring up these issues? We say that the defense didn't have those things. But more of a question, why didn't the prosecutor have the Reyes sisters testify? They are not normal attorneys like we are in the courtroom. We advocate for our clients. Prosecutors advocate for the state of California. They are in a different position. They are there for one purpose, to see that justice is done, not to win cases. Here they had evidence, and they didn't present it. Why not? The Mr. Stoddard read verbatim what the court said about the Reyes sisters' conversations. And, again, I'm just going to repeat it. The conversations with the Reyes sisters were brought forth for the first time in the in regard to the identity of the shooter. That identity, that conversation was never brought up in the trial. Why not? Why didn't the prosecution bring it up? Because it hurts their case. It creates reasonable doubt, and they didn't want that.  They were looking for a conviction. Whether or not Mr. Reyes was in Lock 10 that night. I guess your proposition that if you're talking about material that you said wasn't delivered to the defense. I'm sorry? If I hear you, it sounds as if the prosecution, if it delivers information to the defense, may still have a duty to introduce it themselves. Absolutely. But why don't they just let the defense decide which information ought to be used as part of the defense? Does the prosecution have to put on a defense along with its case? Because they have a different duty, Your Honor. Forty years ago, I took an oath, and I said I'm going to do justice. I didn't say I'm going to convict this man if I know there's reasonable doubt. That's not what they're doing. Suppose they don't believe the witness. They still have to put him on? Oh, no. If they don't believe the witness, absolutely not. If you don't believe the witness, you have doubt about the witness, you don't have to put him on. So if they come up with a theory of the case, and they have other witnesses that would contradict the theory of the case, but they don't believe those witnesses, why do they have to put him on? They don't. Is that what happened? No. That's not what happened, Your Honor. They believe these sisters. They wrote them up on the report. There's no evidence that either Achievist or Freislich did not believe what these sisters had told them. Mr. Reyes knew about the gun. He was hiding the gun. He was mad about the gun. They heard direct testimony that somebody pulled a trigger, and it went click, click, click. They never offered it to the defense. The defense never had it, and they never offered it in court. Why not? Can you imagine the effect on a jury if the Reyes sister says, I heard my brother tell Mr. Reyes that he pulled the trigger, click, click, click. Bang. What happens in that jury room? I see that you're out of time. Thank you, Mr. Hamler. Mr. Wiley, Mr. Stoddard, thank you as well. The case thus argued is submitted. Thank you.
judges: Canby, T.G. Nelson, Silverman